# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| TEXAS TECHNICAL INSTITUTE, INC., | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-04-3349 |
| | § | |
| SILICON VALLEY, INC., *et al.*, | § | |
| *Defendants*. | § | |

## MEMORANDUM, RECOMMENDATION, AND ORDER

This lawsuit concerns the sale of the Houston campus of a technical school. The purchaser, Texas Technical Institute, Inc. (TTI) brings suit against the seller, Silicon Valley, Inc., and its president, Akber Mithani (collectively "Silicon Valley"), asserting contract and tort claims. Silicon Valley is countersuing TTI and Suzanne VanCapelle, the president and sole shareholder of TTI, for breach of lease. Before the court is Silicon Valley's motion for summary judgment on TTI's claims against it (Dkt. 42), and Silicon Valley's motion for partial summary judgment on their counterclaim against TTI (Dkt. 44). Silicon Valley also moves to exclude TTI's expert testimony and strike the expert report (Dkt. 46). A hearing was held on these motions January 19, 2006. For the reasons that follow, the court recommends that the two motions for summary judgment be granted, and finds the motion to exclude is moot and will therefore deny it.

## Background

In late March 2003, Silicon Valley accepted an offer by VanCapelle to purchase the assets of Silicon Valley's Houston campus. Shortly thereafter VanCapelle formed Texas Technical Institute, Inc. as the corporate entity to operate the venture,[1] and over the next several months VanCapelle and her sister Nancy Robinson, acting on TTI's behalf, performed a due diligence review of Silicon Valley's business and records.[2]

On October 1, 2003, the parties signed an asset purchase agreement, and the campus and school were transferred as an ongoing concern from Silicon Valley to TTI.[3] VanCapelle operated the school until April 21, 2004, when it closed for financial reasons. At that point, VanCapelle urged Silicon Valley to repurchase the school. When Silicon Valley refused, TTI filed this suit.[4]

TTI asserts claims for breach of contract, fraud, negligent misrepresentation, and detrimental reliance related to this transaction.[5] Defendants Silicon Valley and Mithani in turn allege that TTI and VanCapelle breached their obligations under the

---

[1] *See* Dkt. 42, Ex. A.

[2] *See* Dkt. 42, Ex. D, 54-57; Dkt. 51, Ex. B.

[3] *See* Dkt. 42, Ex. B.

[4] *See* Dkt. 51, Ex. B.

[5] *See* Dkt. 1, Ex. 3 (Pl.'s Am. Orig. Pet.).

purchase agreement by failing to pay the rent on the lease that TTI assumed from Silicon Valley.[6]  Federal jurisdiction is based on the diverse citizenship of the parties, as Silicon Valley and Mithani are Georgia residents, while TTI and Suzanne VanCapelle are citizens of  Texas.

## Analysis

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on its pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[6] *See* Dkt. 6.

I.    **Silicon Valley's Motion for Summary Judgment on TTI's Claims**

A.    **Breach of Contract**

TTI's amended petition alleges only a single[7] breach of contract by Silicon Valley–*i.e.*, "failing to provide the number of [student] accounts represented."[8]  Dkt. 1, Ex. A, ¶ 9.  The familiar elements of a breach of contract claim under Texas are: (1) the existence of a valid contract; (2) the performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach.  *See, e.g., Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003).

TTI does not cite any specific contract provision explicitly requiring Silicon Valley to provide any particular number of student accounts.  It is not even clear whether the operative agreement to which TTI refers is the purchase offer or the asset purchase agreement.  In any event, VanCapelle has admitted in her deposition that

---

[7] Silicon Valley's motion seeks to recast several of TTI's misrepresentation claims as contract claims, but the court will address these claims as actually pleaded by TTI.

[8] In response to TTI's claims, Silicon Valley and Mithani initially challenge TTI's standing to assert these causes of action.  The defendants assert that TTI was not a party to the purchase offer or the asset purchase agreement because it was not a signatory, nor was it incorporated until after these agreements were signed.  This contention fails because under Texas law, a corporation may sue to enforce or recover damages for the breach of a pre-organization contract.  *See Moore v. Dallas Post Card Co.*, 215 S.W.2d 398, 401 (Tex. Civ. App.–Dallas 1948, writ refused, n.r.e.); *see also Trinity Fire Ins. Co. v. Kerrville Hotel Co.*, 103 S.W.2d 121, 126 (Tex. 1937) (hotel could enforce pre-incorporation contract after adopting and ratifying same); *see generally* 1A WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF PRIVATE CORPORATIONS § 214 (2005) (if a contract is one inuring to the corporation, and it has adopted the contract of otherwise succeeded to it, it has a right to enforce the contract or sue for breach in either its own name, or with the promoter).  Texas law also appears to allow claims based on pre-incorporation fraud.  *See, e.g., Moore*, 215 S.W.2d at 404.  Accordingly, TTI has standing to bring these claims against the defendants.

4

Silicon Valley provided all the enrolled student accounts it had, which is consistent with its obligation to transfer business assets under either agreement.[9] At the hearing, TTI did not challenge the factual accuracy of VanCapelle's admission, nor did TTI explain how its contract claim could survive in light of this admission.  For this reason, TTI cannot establish the contract breach it alleged, and Silicon Valley is entitled to judgment as a matter of law on this claim.

### B.    Fraud

TTI asserts that Silicon Valley committed fraud by misrepresenting the financial condition of the school and by falsely stating that the school was in compliance with Texas Workforce Commission (TWC) regulations for state-licensed career schools.[10]  To prove fraud under Texas law, a plaintiff must show that: (1) the defendant made a false material representation consisting of either a positive untrue statement of material fact, the concealment of a material fact, or nondisclosure of a material fact which he had a duty to disclose; (2) the defendant knew the material representation was false or made it recklessly without any knowledge of its truth; (3) he made the representation with the intent that it should be acted upon by the

---

[9] *See* Dkt. 42, Ex. C, 206.

[10] *See* Dkt. 1, Ex. A, ¶ 10.

plaintiff; (4) the plaintiff acted in reliance upon the representation, and (5) the plaintiff suffered injury. *See Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1298-99 (5th Cir. 1988). TTI has failed to establish a genuine issue of material fact on these elements with respect to either fraud claim.

### 1.    Financial Condition

TTI's contention that the financial condition of the school was misrepresented is not based on any affirmative statement of past or existing fact by Silicon Valley. Instead, this claim hinges on a promise contained in section 15 of the purchase offer, entitled "Maintenance of Goodwill," which reads in pertinent part:

> Until possession is delivered, SELLER agrees to continue to operate the business in the manner in which it is being operated at the date of this offer and to maintain the goodwill of the business and all personal property in normal working order subject to the exceptions and/or exclusions listed below....This also specifically means SELLER shall not raise or lower selling and/or service prices, raise or lower employee wages, fire, lay off or make other substantive changes in company personnel, modify existing credit terms or make any other substantive change to standard operating procedures or the assemblage of fixtures, machinery or other operating equipment in affect [sic] a[t] the time of this offer without first notifying PURCHASER in writing of such need or intention to do so and obtaining PURCHASER'S written approval for such actions.[11]

According to TTI, Silicon Valley did not honor its commitment "to continue to operate the business in the manner in which it is being operated at the date of this

---

[11] Dkt. 42, Ex. A.

6

offer [*i.e.*, March of 2003]."   In particular, TTI points to a dramatic decrease in revenues, student enrollments, classes conducted, and marketing efforts between March 2002 and the date of purchase in October 2003.

This claim is deficient in several respects.   First of all, VanCapelle was unquestionably aware of the decline in the school's financial condition prior to the October closing date.   On May 29, 2003, after the purchase offer was extended, and well before the final decision to purchase the school was made, VanCapelle sent an e-mail to Alex Mithani specifically commenting, with respect to advertising and enrollments, that "[b]oth are down."[12]   VanCapelle continued:

> I recognize that you wish to minimize all costs until closing, but what is your strategy to ramp enrollment up again prior [to] the close so that "normal operating levels" are in place[?]   **This can certainly be worked around**, probably easier in a live conversation together than via e-mail.[13]

This knowledge of the decline in the school's financial condition was facilitated by TTI's due diligence inspection of Silicon Valley's operations and financial records. Suzanne VanCapelle's sister, Nancy Robinson, was deposed as the corporate representative of TTI under Federal Rule of Civil Procedure 30(b)(6).   In that deposition, Robinson testified that she spent between two to three weeks at the

---

[12] Dkt. 75, Ex. E.

[13] Dkt. 75, Ex. E (emphasis added).

Houston campus on this due diligence inspection, which included a review of every student file.[14]   She conceded that there were no concealments or false information provided by Silicon Valley during due diligence.[15]  Robinson further explained that while some "mistakes" were made, they were not material to the deal.[16]  By virtue of its due diligence review, TTI had ample notice of Silicon Valley's true financial condition prior to closing.  In light of this knowledge, TTI has no credible claim of justifiable reliance upon a prior false promise regarding continued operations.

---

[14] *See* Dkt. 42, Ex. D, pp. 54-57.

[15] *See* Dkt. 42, Ex. D, pp. 67-68.

[16]

| | |
|---|---|
| A. | I actually went to the campus and went through all of the student files.... |
| | .... |
| | Also, I went through and did an inventory check of, you know, all of the computers and stations and stuff like that.  So, I was able to go through every student file, right, and everything was in there .... |
| | Okay.  So, then, [I] took the net income statements and verified it, like, verified it against the students.  And then, verified the advertising that had been done.  And this was early on.  All of this was early on. |
| | .... |
| | Right.  And verified the – like, really verified everything that was on the net income statement, everything I could. |
| | .... |
| | You know, there were some things that weren't on what they had provided.  They were – they were minor things.  I would not say it was a misrepresentation of those things, but there were mistakes.  There were all sorts of mistakes. |
| Q. | The mistakes you would expect to find in a business, and you could correct them; and they wouldn't be material? |
| A. | And I asked for verification or justification on those things. |
| Q. | Was it provided? |
| A. | In most cases. |
| | .... |
| A. | Okay.  There were some things that I never did get the information for.  Again, they were – you're talking about the due diligence time; is that correct? |
| Q. | Correct. |
| A. | But they weren't big things.  It wasn't – it wasn't anything I was concerned over. |

Dkt. 42, Ex. D, pp. 54-57.

In any event, the "continue to operate" clause cannot reasonably be read as a guarantee that revenues, enrollment, and classes would be maintained at precisely the same levels through the time of closing, regardless of any external business or marketing conditions. Given the context, the more natural reading of the clause is that Silicon Valley would not impair existing good will by shutting its doors, raising fees, or making other substantive changes to standard operating procedures without TTI's approval. Standing alone, even a dramatic decrease in revenue does not imply a change in standard operating procedure by Silicon Valley. In other words, maintaining standard operating procedures in the face of changing market conditions is no guarantee against declining revenue.

Even if the "continue to operate" clause were construed as broadly as TTI contends, there is still no evidence that Silicon Valley failed to comply. The clause obligates Silicon Valley to continue to operate the business in the same manner as it was "at the date of this offer," which is March 2003. There is no evidence whatever establishing a baseline of revenues, student enrollment, classes conducted, or marketing efforts as of that date. Instead, TTI points to decreases as measured from March and September of 2002. Absent any reason to believe that a significant portion of these decreases occurred after the baseline date of March 2003, there is no

basis to hold Silicon Valley responsible for financial conditions which (as far as the summary judgment record shows) pre-existed TTI's purchase offer.

Lastly, TTI has offered no evidence of intent to commit fraud by Silicon Valley. Because this fraud claim is based on a false promise rather than a misrepresentation of existing fact, TTI has the burden of proving that Silicon Valley intended not to perform at the time the promise was made. *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275,1299 (5th Cir. 1988). Ultimate failure to perform a promise is not evidence of initial intent not to perform. *Id.* at n.36. TTI has offered no evidence whatever suggesting that Silicon Valley acted with the requisite intent.

In sum, there is no substantial evidence that Silicon Valley materially misrepresented or concealed the school's financial condition. Nor is there evidence that Silicon Valley made a knowingly false promise that the school's financial condition would not decline after March 2003. In fact, TTI was aware of the school's declining revenue well before the purchase was consummated, and so could not have reasonably relied on any representations to the contrary. Silicon Valley is entitled to summary judgment on this claim.[17]

---

[17] Silicon Valley also asserts that the merger clause contained in the asset purchase agreement bars this fraud claim. Under Texas law, "a fraud claim can be negated where a merger clause evinces a party's clear and unequivocal expression of intent to disclaim reliance on specific representations." *Armstrong v. American Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003). The merger clause in this case does not disclaim reliance, however, and unlike *Armstrong* there are no other contract provisions from which a clear intent to disclaim reliance may be inferred. Accordingly, the merger clause is not sufficient ground in itself to bar TTI's fraud claims.

10

## 2.   TWC Compliance

TTI fares no better on its remaining fraud claim regarding the purported violation of Texas Workforce Commission rules.  The source of this claim is Article 2 of the asset purchase agreement, in which Silicon Valley represented that it "has to its knowledge operated the business in accordance with all laws, ordinances, and rules relating to the business."  TTI maintains that this assurance was false, and alleges broadly that Silicon Valley committed numerous violations of many TWC rules.

TTI has no evidence of a finding by the TWC itself that Silicon Valley was in violation of its rules and regulations.  Instead, to support its assertion of non-compliance, TTI relies on: (1) warnings issued by the TWC in 2002; and (2) an affidavit submitted by VanCapelle.

With respect to the TWC warnings, Silicon Valley had advertised and enrolled students in early 2002 before the TWC issued a required certificate of approval.  By letter dated March 21, 2002, the TWC warned Silicon Valley that if it continued such practices, no certificate of approval would be issued.[18]  TWC's concerns about the pre-certification advertising and enrollments were obviously resolved to its

---

[18] *See* Dkt. 73, Ex. A.  These documents were obtained by TTI pursuant to a Texas Open Records Act request, and filed with the court two days before the summary judgment hearing.  The court admitted these late-filed documents over Silicon Valley's objection.

satisfaction, because a certificate of approval was issued on May 15, 2002, and a renewed certificate of approval was issued the following year.[19]   The certificate recites that Silicon Valley "has met the legal requirements prescribed in Chapter 132, Texas Education Code, and is hereby authorized to operate....Continued approval will be subject to compliance with the legal requirements for proprietary schools...."[20] From this evidence the only reasonable inference is that Silicon Valley was in full compliance with TWC rules and regulations at all times relevant to this transaction.

The only other evidence TTI offers that Silicon Valley violated TWC rules and regulations is in the form of an affidavit from VanCapelle, which lays a host of fraudulent wrongdoing at the feet of Silicon Valley.   Silicon Valley objects to the affidavit as conclusory and not based on personal knowledge.

Federal Rule of Civil Procedure 56(e) provides that an affidavit supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  FED. R. CIV. P. 56(e). Affidavits not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an

---

[19] *See* Dkt. 51, Ex. 16.

[20] Dkt. 51, Ex. 16.

12

affidavit that do not comply with Rule 56(e) are not given weight or considered in deciding a motion for summary judgment.  *See Richardson v. Oldham*, 12 F.3d 1373, 1378-79 (5th Cir. 1994).  Conclusory affidavits are also insufficient to create or negate a genuine issue of fact.  *See Travelers Ins. Co v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).  Although the admissibility of the affidavit may be questionable,[21] the court will consider it for purposes of this summary judgment motion.  Even so, its conclusory nature is insufficient to create a genuine issue of fact.

VanCapelle's affidavit is a farrago of largely unsubstantiated assertions about Silicon Valley's business practices.   Specifically with respect to the TWC, VanCapelle alleges that "SV maintained its licensure with TWC by deceit, it made omissions, provided fraudulent documents and records in its representation to TWC during investigations and audits.  TWC Rules & Regulations (see TTI #12)."[22]  TTI #12 is ninety-two pages of Texas Workforce Commission rules and regulations rather than evidence showing non-compliance with those rules and regulations.   The

---

[21] The affidavit makes conclusory assertions based almost entirely upon unauthenticated records apparently obtained from Silicon Valley.  TTI attempts to invoke the business records exception to the hearsay rule, but no custodian or other qualified witness from Silicon Valley has laid the foundation for admissibility on this ground.  VanCapelle's affidavit asserts that "except where otherwise indicated," these records were made by an employee or representative of TTI at or near the time of the act or event recorded. But this predicate cannot possibly apply to documents which were obtained from Silicon Valley, which in many instances predate the creation of TTI itself in April/May 2003. It is true that, upon proper authentication, statements in these documents could be admissible as admissions by a party-opponent under Federal Rule of Evidence 801(d)(2).  Because Silicon Valley has offered no evidence that the documents it produced are not authentic, the court will treat these documents and VanCapelle's affidavit as admissible for purposes of this motion.

[22] Dkt. 51, Ex. B.

affidavit continues with similar blunderbuss charges of TWC rules violations related to student refunds, over-charging, and inaccurate class schedules. But VanCapelle was neither an employee or agent of the TWC. Her conclusions that these violations occurred are entirely based on her subjective belief and opinion rather than on personal knowledge of any of the transactions.

Another problem with this affidavit is that it contradicts much of Robinson's deposition testimony without explaining why. Robinson was deposed as a corporate representative of TTI under Rule 30(b)(6), and offered binding testimony on behalf of the corporation. *See* FED. R. CIV. P. 30(b)(6); *see also Hyde v. Stanley Tools*, 107 F. Supp. 2d 992 (E.D. La. 2000) (because there is no distinction between a Rule 30(b)(6) corporate representative and the corporation, the corporation may not defeat a summary judgment motion with an affidavit that directly contradicts an earlier Rule 30(b)(6) deposition). She testified that there were no material misrepresentations during the due diligence period and that other than a few minor mistakes, she was able to verify and justify student records, accounts, net income statements, and advertising. No explanation is offered to explain this conflict between the deposition testimony of TTI's corporate agent and the affidavit of TTI's president. Under federal summary judgment procedure, when the sole evidence purporting to create a genuine issue of material fact is an affidavit that contradicts deposition testimony, the

14

party offering the affidavit must provide an explanation of that conflict.  *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002).  A party may not defeat a motion for summary judgment using an affidavit that impeaches, without explanation, its sworn deposition testimony.  *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 385-87 (5th Cir. 2000); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).  VanCapelle's affidavit is therefore insufficient to preclude summary judgment for Silicon Valley on this fraud claim.

### 3.    Non-Disclosure

Finally, TTI's pleadings might be generously construed to assert fraud based not only on affirmative misrepresentation, but also upon fraudulent non-disclosure or concealment.  For purposes of this motion, the court will indulge the assumption that TTI's pleadings would satisfy the particularity requirements of Rule 9(b) with regard to fraud claims.

Texas courts have recognized fraudulent non-disclosure claims, which require the same elements of proof as other types of common law fraud, "with the exception that the misrepresentation element can be proven by the non-disclosure or concealment of material facts *in light of a duty to disclose.*"  *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 567 (5th Cir. 2005) (emphasis supplied).  In an ordinary buy-sell transaction conducted at arms-length, there is no

affirmative duty of disclosure.  Non-disclosure is neither fraudulent, nor negligent, unless there is first a duty to disclose the information.  *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001); *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).  Moreover, no general duty of disclosure arises between parties contemplating a contract.  *Jabri v. Alsayyed*, 145 S.W.3d 660, 670 (Tex. App.–Houston [14th Dist.] 2004, rehearing overruled); *Fleming v. Texas Coastal Bank of Pasadena*, 67 S.W.3d 459, 461 (Tex. App.–Houston [14th Dist.] 2002, pet. denied).

Generally a duty to disclose arises only where there is a fiduciary or confidential relationship between the parties.  *See Morris*, 981 S.W.2d at 674; *see also United Teacher*, 414 F.3d at 566 (noting in dicta that some courts "have not gotten the message ... that a duty to disclose can[not] exist in Texas absent a confidential or fiduciary relationship"); *Sergeant Oil & Gas Co., Inc. v. National Maintenance & Repair, Inc.*, 861 F. Supp. 1351, 1358 (S.D. Tex. 1994) ("When no representations are made, the failure to disclose information does not constitute fraud in the absence of a fiduciary or other special relationship between the parties").

There are two types of fiduciary relationships.  The first is a formal fiduciary relationship which arises as a matter of law, typified by such relationships as a partnership, attorney-client, and principal-agent.  *See Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Texas Bank & Trust Co. v. Moore*, 595

16

S.W.2d 502, 507 (Tex. 1980).  The second is an informal fiduciary relationship which may arise "from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship."  *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998).  To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit.  *See id.* at 288.

There was no formal fiduciary relationship between TTI and Silicon Valley. There is also no suggestion of an informal fiduciary relationship between these parties based on a confidential relationship existing prior to the sale of the technical school; the only connection between TTI and Silicon Valley is the transaction that is the basis of this suit.  On this record, Silicon Valley was under no duty to disclose material information about this transaction to TTI.

Finally, Robinson's deposition testimony conceding that Silicon Valley did not hide any information from TTI during the due diligence process would preclude a fraudulent non-disclosure claim, even assuming the presence of a duty to disclose. For these reasons, Silicon Valley is entitled to summary judgment on any claim of fraud by non-disclosure.

17

### C.   <u>Negligent Misrepresentation</u>

In its amended petition, TTI asserts that in the course of the negotiations for the sale of the Houston campus, the defendants falsely represented: (1) that the annual revenue of the school was more than it was; (2) that the school was licensed and operating in accordance with the rules and regulations of the TWC; and (3) other matters relating to the defendants' marketing efforts and student loan facilities.[23]

Under Texas law, a claim for negligent misrepresentation consists of four elements: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *General Elec. Capital Corp. v. Posey*, 415 F.3d 391, 395-96 (5th Cir. 2005). However, "Texas law does not recognize a duty to avoid negligent misrepresentations arising from an arms-length, at-will relationship." *Coburn Supply Co., Inc. v. Kohler Co.*, 342 F.3d 372, 377 (5th Cir. 2003). "'[I]n order to prove negligent misrepresentation, [the plaintiff] must, as a threshold matter, prove that [the

---

[23] *See* Dkt. 1, Ex. A, ¶ 11.

defendant] owed her a duty.'" *Id.* (quoting *Steptoe v. True*, 38 S.W.3d 213, 219-20 (Tex. App.–Houston [14th Dist.] 2001, no pet.)).

At the motion hearing, TTI acknowledged that the sale of the technical school was an arms-length transaction and that no special or fiduciary relationship existed between the parties. Moreover, when asked to specifically identify the misrepresentation that it was asserting, TTI merely referred back to its intentional misrepresentation claim, leaving no identifiable claim for negligent misrepresentation that exists apart from the cause of action for fraud.

Justifiable reliance is no less required for a claim of negligent misrepresentation than it is for fraud. Generally, reliance on representations made in a business or commercial transaction is not justified when the representation takes place in an adversarial context. *Coastal Bank ssb v. Chase Bank of Texas, N.A.*, 135 S.W.3d 840, 843 (Tex. App.–Houston [1st Dist.] 2004); *Swank v. Sverdlin*, 121 S.W.3d 785, 803 (Tex. App.–Houston [1st Dist.] 2003, writ denied). This is because a party to an arms-length transaction must exercise ordinary care and reasonable diligence for the protection of her own interests, and failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *See Coastal Bank*, 135 S.W.3d at 843.

The sale of the school was an arms-length transaction in which the seller was under no duty to avoid negligent misrepresentation, and the buyer could not reasonably have relied on such misrepresentations, assuming any were made. Silicon Valley is entitled to summary judgment on the negligent misrepresentation claim.

### D.    Detrimental Reliance

In its amended petition, TTI asserts as a separate cause of action, "detrimental reliance," reiterating its prior allegations against the defendants.[24]   At the motion hearing, TTI acknowledged that detrimental reliance is not an independent cause of action and this acknowledgment is consistent with Texas law.  *See, e.g., Ludman v. Pacific Southwest Bank, F.S.B.*, 1998 WL 834677, at *3 (Tex. App.–Dallas, 1998) ("detrimental reliance" is an element of promissory estoppel, not a separate tort); *Garner v. Corpus Christi Nat. Bank*, 944 S.W.2d 469, 480 (Tex. App.–Corpus Christi 1997, writ denied) ("reliance" is not an independent case of action but an element of other causes of action).  Thus, summary judgment should issue on this claim as well.

---

[24] *See* Dkt. 1, Ex. A, ¶ 12.

## II.   Silicon Valley's Motion for Partial Summary Judgment on their Counterclaim against TTI

Silicon Valley is entitled to summary judgment on its contractual counterclaim based on TTI's failure to pay rent under the assumed lease.[25]   As part of the asset purchase agreement, TTI assumed the lease from Silicon Valley, with Silicon Valley remaining secondarily liable.[26]   The asset purchase agreement also contains an indemnification clause whereby "Buyer shall indemnify and hold Seller harmless from any and all liabilities that may arise as a result of acts performed or not performed by Buyer or Buyer's employees, agents, or assigns at or subsequent to the time of closing."[27]

TTI took possession of the Houston campus on October 1, 2003, and remained in possession until April 22, 2004.  At that point it discontinued operations and vacated the premises.  TTI admittedly has paid no rent since February 2004, and the lease does not expire until approximately March 2007.[28]   TTI contends that its obligation to pay rent is excused by the prior breach of contract by Silicon Valley and Akber Mithani, and relies upon *Mustang Pipeline Co., Inc. v. Driver Pipeline Co.,*

---

[25] Silicon Valley seeks summary judgment solely against TTI in this motion.  *See* Dkt. 45, n.1.

[26] *See* Dkt. 44, Ex. B.

[27] Dkt. 42, Ex. B.

[28] *See* Dkt. 44, Ex. A (leased commenced January 2002 and has a term of sixty-three months).

21

*Inc.*, 134 S.W.3d 195, 196 (Tex. 2004), for the proposition that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.[29]

While it is true in general that the material failure to perform on a contract by one party may suspend or discharge the other party's duty to perform, such an excuse for non-performance is an affirmative defense which TTI has the burden of proving. *See Hassell Constr. Co., Inc. v. Stature Commercial Co., Inc.*, 162 S.W.3d 664, 667 (Tex. App.–Houston [14th Dist.] 2005, no pet.); *CDS Enterprises, Inc. v. Myrad Real Estate, Inc.*, 1999 WL 548226, at *5 (Tex. App.–Houston [14th Dist.] 1999, no pet.). As analyzed in depth above, TTI has not in fact shown any breach of contract by Silicon Valley. It follows that TTI's failure to pay rent is not excused by the material breach doctrine.

There is no dispute of material fact here. TTI assumed the lease. Paying rent was an obligation under the lease. TTI did not pay rent as required. TTI further agreed to indemnify Silicon Valley in such an event. Summary judgment should

---

[29] TTI also argues that Silicon Valley and Mithani offer no evidence of damages caused by its failure to make rental payments, contending this to be a necessary predicate for a breach of contract claim. However, under Federal Rule of Civil Procedure 56(c), "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is genuine issue as to the amount of damages." FED. R. CIV. P. 56(c). Thus, the absence of evidence of the amount of the breach does not preclude partial summary judgment. *See Trinet Corporate Realty Trust Inc. v. Microsoft Corp.*, 2004 WL 1217936, at *3 (N.D. Tex. 2004).

therefore issue on that portion of Silicon Valley's counterclaim seeking to establish liability for the breach of the lease.

III.  **Silicon Valley and Akber Mithani's Motion to Exclude TTI's Expert Testimony and Expert Report (Dkt. 46)**

In light of the court's recommendation of summary judgment in favor of Silicon Valley and Akber Mithani on TTI's claims against them, the motion to exclude TTI's expert testimony and expert report is moot.  Accordingly, it is dismissed.

The parties have ten days to file written objections.  Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error.  *See* FED. R. CIV. P. 72.

Signed on January 31, 2006, at Houston, Texas.

Stephen Wm Smith
United States Magistrate Judge

23